UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| VICTOR M., <br><br> Plaintiff, <br><br> v. <br><br> KILOLO KIJAKAZI, Acting Commissioner of the Social Security Administration, <br><br> Defendant. | Case No. 20-cv-7073 <br><br><br> Judge John Robert Blakey |

**MEMORANDUM OPINION AND ORDER**

In this social security appeal Plaintiff Victor M. asks the Court to reverse the Commissioner's decision denying his claim for Disability Insurance Benefits (DIB), *see* [1], [11]. In response, the Commissioner asks the Court to affirm her decision. *See* [18]. For the reasons explained below, the Court affirms the decision to deny benefits and denies Plaintiff's request for reversal.

I.  **Factual Background & Procedural History**[1]

Plaintiff applied for DIB on May 8, 2018, alleging that he became disabled on August 17, 2014, because of complications (including pain) from a right femur fracture, seizures, depression, low back pain, and high blood pressure. The Social Security Administration (SSA) denied his claim initially on September 21, 2018, R. at 65–83, and on reconsideration on April 17, 2019, R. at 84–105. Plaintiff requested

---

[1] This Court draws all facts from the Certified Administrative Record (R.), [10].

a hearing before an administrative law judge (ALJ), and his case was assigned to ALJ Laurie Wardell, who held the requested hearing on November 26, 2019, R. at 36–64.

At the hearing, Plaintiff testified that he can comfortably sit for an hour and comfortably stand for less than five minutes, R. at 48; and that he uses a cane and can only walk about 20 or 30 feet without it, *id.* at 45. He also testified that he lives with his aunt and has to go up and down about four stairs to get into the house. *Id.* at 40. He explained that he does not drive but can take a bus or train at times; in fact, he took the train to the hearing. *Id.* He further testified that he last worked in April of 2019, collecting metal and doing odd jobs for about four to six hours per day. *Id.* He acknowledged that he worked for Republic Waste Management in North Minneapolis in 2018, but indicated that he only worked there for about a day and a half before his feet "swole" and his "leg started to bother him." *Id.* at 42. He could not explain the note in his file indicating that he had asked his employer for more hours in 2018. *Id.* He testified that he also previously worked as a caregiver for about three years until the end of 2013. *Id.* at 42–43. He acknowledged that he completed a work history form indicating that, as a caregiver, he walked an hour, stood an hour, sat one or two hours, and lifted less than ten pounds. *Id.* at 43. He testified that he worked as a "watchman" for his landlord, and he also did some light landscaping work in the summer months. *Id.* at 43–44.

Despite this history, Plaintiff testified that he has been unable to work since August 2014 because of pain and problems with his hip and balance. R. at 45. He stated that he experiences pain "all the time" at a level of eight out of ten, and that,

2

to alleviate the pain, he lifts his knee to his chest or lays down; he also takes prescription ibuprofen every day, which brings the pain down to about a five. *Id.* at 45–46. He testified that he went to just one physical therapy session, and then was told he could not come any more, possibly because of his insurance. *Id.* at 48. He also testified that he has seizures maybe once every two to three months, even if he takes his seizure medication as prescribed. *Id.* at 47. He also admitted that he drinks alcohol on the weekends, even though he understands alcohol interferes with his seizure medication. *Id.* at 48.

Plaintiff testified that he takes medication for depression, which helps. *Id.* at 49. With regard to daily activities, he testified that he mostly just stays inside the house with his aunt and watches TV, and he can watch an entire program and do things for himself around the house, like making a sandwich and getting dressed. *Id.* at 49–50. Sometimes he goes out for a ride with his aunt to get some air. *Id.* at 51. He has children but he only sees them two or three times a year. *Id.* at 49.

The ALJ also heard from vocational expert (VE) Liala Slaise, who listened to Plaintiff's testimony about his limitations and past work and classified his landscaping work (which Plaintiff performed at the light exertional level) as unskilled, SVP 2 and his caregiver work (also performed at the light exertional level) as semiskilled, SVP 3. R. at 57.

The ALJ asked the VE to consider a hypothetical person with Plaintiff's age, education, and work history, who: was limited to light work; was precluded from pushing and pulling with the right lower extremity; could frequently climb ramps and

3

stairs but never climb ladders, ropes, or scaffolds; could balance frequently; could stoop, kneel, crouch, and crawl occasionally; could occasionally be exposed to hazards; and was limited to simple, routine repetitive tasks, simple work-related decisions, occasional changes in work environment, and occasional interactions with supervisors, co-workers, and the public. R. at 57–58. The VE testified that such a person would not be able to perform Plaintiff's past work, R. at 58, but could perform other work existing in significant numbers in the national economy, including the jobs of cleaner (light exertion, unskilled, SVP2, 133,108 jobs), marker (light exertion, unskilled, SVP2, 309,645 jobs), and silver wrapper (light exertion, unskilled, SVP1, 107,630 jobs). *Id.*

The ALJ next asked the VE to consider a hypothetical person who, in addition to the above limitations, needed to shift position from sit to stand (or back) for one or two minutes every 30 minutes, while remaining on task. R. at 59. The VE testified that this person could still perform the representative jobs she identified. *Id.*

Finally, the ALJ asked the VE whether the hypothetical person could perform other work if he were limited to sedentary exertional level work. *Id.* The VE testified that this person could perform the jobs of table worker (sedentary exertion, unskilled, SVP2, 3,067 jobs), stuffer (sedentary exertion, unskilled, SVP2, 4,198 jobs), and document preparer (sedentary, unskilled, SVP2, 46,646 jobs). R at 60. The VE testified that if the person had to be off task because of pain more than 15% of the workday, all work would be precluded. *Id.* She testified that, on average, 15% or more off task would preclude employment and anything below that would be

4

tolerated. *Id.* She also testified that absenteeism in excess of one absence per month would preclude employment, in combination with arriving late and leaving early. R. at 60–61. The VE further testified that use of a cane would preclude light exertional work but would not impact sedentary level work. R. at 61–62. She testified that laying down would not be permitted on the job, except during breaks, that unscheduled breaks would not be tolerated on an ongoing basis, and that all work would be precluded if the person needed to change position at will. R. at 62–63. Finally, she testified that, even in the sedentary jobs, if the person needed to stand periodically at will to address pain, that also would preclude all work. *Id.*

The ALJ issued an unfavorable decision on December 27, 2019. R. at 14–30. She determined that Plaintiff met the insured status requirements of the Social Security Act (the Act) through December 31, 2020; that he had not engaged in substantial gainful activity since August 17, 2014 (the alleged onset date); that he had the severe impairments of osteoarthritis of the right hip, status-post right femur fracture with surgical repair, epilepsy, depression, general anxiety disorder, and alcohol use disorder; and that his impairments (even in combination) did not meet or medically equal a listed impairment. R. at 16–22. Additionally, the ALJ found that Plaintiff had the residual functional capacity (RFC) to:

> perform light work as defined in 20 CFR 404.1567(b) except he would need to be able to shift positions for 1-2 minutes every 30 minutes from sitting to standing or vice versa while remaining on task; he cannot push or pull with the right lower extremity; he can frequently climb ramps and stairs, but never climb ladders, ropes, or scaffolds; he can frequently balance, and occasionally stoop, kneel, crouch, and crawl; he can tolerate occasional exposure to hazards; he is limited to work involving simple, routine, repetitive tasks and simple work-related decisions; he can

5

Case: 1:20-cv-07073 Document #: 23 Filed: 06/10/22 Page 6 of 18 PageID #:1086

>handle occasional changes in the work setting; and can tolerate occasional contact with supervisors, co-workers, and the general public.

R. at 22. Based upon this RFC, the ALJ determined that Plaintiff could not perform any of his past work. R. at 28–29. But she found that, based upon his age, education, work experience, and RFC, he could perform other work existing in significant numbers in the national economy. R. at 29–30. As result, she found Plaintiff not disabled and denied his claim for benefits. *Id.* at 30.

Plaintiff requested review, and the Appeals Council denied his request on September 25, 2020, R. at 1–3, making the ALJ's decision the final decision of the Commissioner. Plaintiff filed suit in this Court on November 30, 2020, seeking review of that decision. *See* [1].

## II. <u>Legal Standard</u>

An ALJ's findings of fact are "conclusive" as long as they are supported by "substantial evidence." 42 U.S.C. § 405(g). The "threshold for such evidentiary sufficiency is not high"; it "means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Thus, after a "critical review of the evidence," *Edwards v. Sullivan*, 985 F.2d 334, 336 (7th Cir. 1993), the Court affirms any adequately supported denial, even if reasonable minds could disagree about disability status, *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008), remanding only if the decision lacks evidentiary support or adequate discussion of the issues, *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

6

The SSA defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The SSA's regulations prescribe a five-part sequential test for determining disability, *see* 20 C.F.R. §§ 404.1520(a), 416.920, requiring the Commissioner to consider whether: (1) the claimant has performed any substantial gainful activity during the period for which claimant asserts disability; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any listed impairment; (4) the claimant retains the residual functional capacity to perform ("RFC") claimant's past relevant work; and (5) the claimant is able to perform any other work existing in significant numbers in the national economy. *Id.*; *see also Zurawski v. Halter*, 245 F.3d 881, 885 (7th Cir. 2001).

### III. Discussion & Analysis

Plaintiff argues that the ALJ's decision must be reversed because she improperly assessed the opinion evidence in the record. In particular, he argues that the ALJ improperly discounted the opinions offered by Dr. Ignas Labanauskas, Plaintiff's orthopedic specialist. *See* [11] at 8–12. He also argues that the ALJ failed to properly assess whether Plaintiff's condition satisfied the listings at Step 3. *Id.* at 13–14. Finally, he argues that the ALJ erred in assessing his symptoms. *Id.* at 14–15. The Court considers his arguments below.

A.     **The ALJ's Assessment of Dr. Labanauskas' Opinions**

Plaintiff first argues that the ALJ improperly discounted the opinion evidence from Dr. Labanauskas. [11] at 9–12. In support, Plaintiff complains that the ALJ discounted Dr. Labanauskas' opinion because he treated Plaintiff only sporadically, yet she credited the opinions of the consultative examiners who had never seen or treated Plaintiff. *Id.* at 9–10. He also argues that she "cherry-picked" evidence to support her findings and failed to grapple with contrary evidence. *Id.* at 10–11. Finally, she argues that the ALJ failed to assess the consultative examiners' opinions in accord with the new regulations and failed to assess "even obvious inconsistencies within the reports from the Agency consultants." *Id* at 12.[2]

As Plaintiff correctly notes, the SSA revised the regulations regarding consideration of medical opinions in early 2017, and the revised regulations apply to applications (like Plaintiff's) filed on or after March 27, 2017.[3] The revised regulation, 20 C.F.R. § 404.1513, redefines how the SSA categorizes evidence, specifying five categories of evidence: (1) objective medical evidence; (2) medical opinion; (3) other medical evidence; (4) evidence from nonmedical sources; and (5) prior administrative medical findings. Evidence from a state agency consultant's review, including an RFC assessment, now falls into this last category and constitutes a prior administrative finding. 20 C.F.R. § 404.1513(a).

---

[2] For example, the consultants both determined that Plaintiff could not stand on his right leg; yet both found that he could be on his feet for six hours in a workday. *Id.*

[3] Plaintiff filed his application on May 8, 2018.

8

The new regulation substantially changes the old procedures as to medical opinions. For starters, the SSA now defines "medical opinion" to mean:

> a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the following abilities: ...
>
> (i) Your ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching);
>
> (ii) Your ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting;
>
> (iii) Your ability to perform other demands of work, such as seeing, hearing, or using other senses; and
>
> (iv) Your ability to adapt to environmental conditions, such as temperature extremes or fumes.

20 C.F.R. § 404.1513(a)(2). The new regulation also replaces the old "treating source rule" (which required the ALJ to give controlling weight to a treater's medical opinion in some circumstances and to give "good reasons" for discounting the weight given to a treater's opinion) with a new rule requiring the ALJ to weigh all medical opinions using the same five considerations: (1) supportability; (2) consistency; (3) relationship with the claimant (including (i) length of the treatment relationship, (ii) frequency of examinations, (iii) purpose of the treatment relationship, (iv) extent of the treatment relationship, and (v) examining relationship); (4) specialization; and (5) other factors as appropriate. 20 C.F.R. § 404.1520c(c). Overall, the new rule emphasizes supportability and consistency as most important factors and requires the ALJ to

9

articulate how she considered these two factors (she may, but need not, explain how she considered the other factors). 20 C.F.R. § 404.1520c(b)(2).

As to supportability, the regulation provides that the "more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1). As for consistency, the "more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(2).

Here, Dr. Labanauskas opined in his medical source statement that Plaintiff met or medically equaled the requirements of listing 1.02a (major dysfunction of a major weight-bearing joint), R. at 895–900. But the ALJ found his opinion inconsistent with the "longitudinal evidence of record," which indicated that Plaintiff generally exhibited "a steady but antalgic gait," and occasionally indicated Plaintiff's "use of a cane as an assistive device." R. at 18. The ALJ also noted that Dr. Labanauskas' opinion was ostensibly based upon "two consultative visits, with little indication that he ever actually provided treatment for the claimant over any sustained period of time." *Id.* For these reasons, the ALJ found Dr. Labanauskas' opinion concerning listing 1.02 to be "unpersuasive as it is inconsistent with the objective medical evidence of record." *Id.* The ALJ also determined that Dr.

10

Labanauskas' opinion concerning Plaintiff's physical limitations lacked support in the record, noting: "specifically, the limitations identified in his opinion are inconsistent with the regular findings from the claimant's providers, which indicated the claimant exhibited largely normal physical functioning including in motor strength and range of motion, and regularly demonstrated a steady gait." R. at 28. She found that the providers' observations were "inconsistent with the severe restrictions identified by Dr. Labanauskas." *Id.* [4]

Nonetheless, Plaintiff argues that the ALJ failed to assess the consultative examiners' opinions in accord with the new regulations and failed to assess "even obvious inconsistencies within the reports from the Agency consultants." *Id* at 12. For example, the consultants both determined that Plaintiff could not stand on his right leg; yet both found that he could be on his feet for six hours in a workday. *Id.* But an inability to stand on one leg does not indicate an inability to stand on both legs, just as the noted inability to heel to toe walk does not indicate an inability to walk at all and the noted inability to stand and walk on toes or heels does not indicate an inability to stand or walk at all. No doctor (not even Dr. Labanauskas) said Plaintiff could not stand or walk at all; in fact, Dr. Labanauskas indicated that Plaintiff could stand/walk less than two hours, R. at 892. Moreover, by his own admission, Plaintiff maintains the ability to stand and walk (with and without the assistance of a cane). Even the consultative examiners noted that Plaintiff could walk

---

[4] Far from merely relying upon "cherry-picked" evidence to support her finding, *id.* at 10–11, the ALJ also acknowledged the contrary evidence (including Dr. Labanauskas' opinion) and explained her reasons for declining to accept it. As set out above, the record confirms that the ALJ articulated how she considered supportability and consistency, satisfying 20 C.F.R. § 404.1520c(b)(2).

11

more than 50 feet without *any* support, stand on his left leg, and get on and off the exam table with no difficulty. R. at 26, 687–90.

Here, the record confirms that the ALJ carefully considered the consultative examiners' opinions, and she found them to be just "somewhat persuasive"; and she actually included additional physical and mental limitations beyond those identified by those examiners. R. at 27–28. The Court finds nothing improper in the ALJ's assessment of the consultative examiners' opinions.

B.     **The ALJ's Step 3 Findings**

Plaintiff next argues that the ALJ erred at step three in assessing whether his severe impairments met or equaled a listed impairment. The "Listings" describe impairments that the SSA considers "to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a). An individual who "satisfies one of the Listings (or its equivalent) is conclusively presumed to be disabled." *Wilder v. Kijakazi*, 22 F.4th 644, 651 (7th Cir. 2022) (citing *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987)). Accordingly, the "criteria for meeting a Listing are interpreted strictly." *Id.* (citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("An impairment that manifests only some of those criteria, no matter how severely, does not qualify.")). Thus, Plaintiff has the burden of showing that his impairments meet a listing, and he must show that his impairments satisfy all of the various criteria specified in that listing. *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006) (citing *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir.1999)).

The Seventh Circuit has held that, at Step 3, an ALJ should mention the specific relevant listings, and if the ALJ fails to do so, and performs just a "perfunctory analysis," remand may be appropriate. *Ribaudo*, 458 F.3d at 583 (citing *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004); *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003); *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002)). But the ALJ here specifically identified which listings she considered, and she explained her reasons for finding that Plaintiff failed to satisfy them:

> I considered the claimant's impairments under section 1.00 for musculoskeletal disorders, including listing 1.02 and 1.06. However, the evidence of record indicates that while the claimant occasionally exhibits a shuffling gait, other notes indicate he exhibits a steady but antalgic gait, with occasional indications of the use of a cane as an assistive device (Ex B1F/5; B2F/69; B4F/9; B6F/73, 81; B15F/21; B20F/3, 19; B24F/13, 42). However, even if required at all times, the use of a cane for ambulation would not meet the definition of an inability to ambulate effectively as defined by 1.00B2b. Accordingly, I find that the evidence does not support a finding that the claimant meets the requirements of listing 1.02A or listing 1.06, and there are no indications any other listing in section 1.00 applies to this case.

R. at 18.

She also explained that she considered Plaintiff's impairments under Section 11.00 for neurological disorders, including listing 11.02 for epilepsy, and she explained her reasons for finding that Plaintiff failed to satisfy this listing as well:

> The evidence indicates that there may be an element of failure to follow prescribed treatment in regards to the recurrence of his seizures by the claimant's own report of missed doses (Ex B24F/5). However, the main issue in this case is that the medical evidence and the claimant's testimony at the hearing do not indicate that he experiences seizures with the frequency required by any of parts A, B, C, or D of listing 11.02. As such, I find that the evidence does not support a finding that the claimant meets the requirements of any applicable listing in section 11.00 for neurological disorders. Finally, I note that there is no opinion

13

> in the evidence of record that the claimant meets or medically equals the requirements of any listed physical impairment.

R. at 18.

The ALJ further indicated that she considered whether Plaintiff's mental impairments, considered singly and in combination, met or medically equaled the criteria of listings 12.04 and 12.06, including whether the "paragraph B" and "paragraph C" criteria were satisfied, and she explained her analysis as to these listings in detail. Indeed, the ALJ devoted three-and-a-half, single-spaced pages to her explanation of why Plaintiff's mental impairments failed to meet or equal the severity of these listings. R. at 19–22. As the record amply confirms, the ALJ's Step 3 analysis was neither perfunctory nor deficient.

Yet Plaintiff argues that the ALJ failed to confront the findings of abnormal gait or explain why she relied solely on the findings of normal gait; he also argues that he could walk just a half block with his cane and a quarter of a block without his cane and that the ALJ failed to explain why this failed to satisfy the "ineffective ambulation requirement of listing 1.02." [11] at 13. Not so. The ALJ explained that, although some evidence showed that Plaintiff occasionally exhibited a "shuffling gait," other notes indicated that he exhibited a "steady but antalgic gait, with occasional indications of the use of a cane as an assistive device." And she cited to evidence in the record to support this finding. R. at 18. She also noted—correctly—that, even if required at all times, the use of a cane does not satisfy the listing. *Id.*

Both Listings 1.02 and 1.06 require Plaintiff to demonstrate an "inability to ambulate effectively," meaning:

14

> an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.
>
> To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. pt. 404, subpt. P, app. 1, sec. 1.00(B)(2)(b). The record contains no evidence to suggest that Plaintiff's use of a cane limited the functioning of both extremities. And, when asked about his limitations, Plaintiff indicated that he could only walk about 20 or 30 feet without his cane, R. at 45; he did not indicate a specific limitation on walking with his cane; nor did he testify to any inability to walk on rough or uneven surfaces. Dr. Labanauskas' notations that Plaintiff could walk "about half a block before he gets irritated" and that Plaintiff "uses a cane in order to help him get around," R. at 897, are not inconsistent with the ALJ's findings and certainly do not establish the requisite limitation specified in the listings. And, to the extent such statements could carry the day, the ALJ explained her reasons for declining to adopt them. R. at 18. In short, the ALJ supported her Step 3 findings with substantial evidence, and Plaintiff has demonstrated no basis to disturb them.

### C.     The ALJ's Assessment of Plaintiff's Alleged Symptoms

Finally, Plaintiff argues that the ALJ reversibly erred in assessing his symptoms. This Court gives special deference to an ALJ's credibility findings, overturning them only if "patently wrong." *Summers v. Berryhill,* 864 F.3d 523, 528 (7th Cir. 2017) (quoting *Eichstadt v. Astrue,* 534 F.3d 663, 667–68 (7th Cir. 2008)); *see also Matthews v. Saul,* 833 F. App'x 432, 437 (7th Cir. 2020) (finding even where the Commissioner conceded the record could be read differently, the ALJ's partially adverse credibility finding was not "patently wrong" and "substantial evidence" supported his conclusion that the plaintiff's complaints "were not entirely consistent with the record."). A decision is "patently wrong" when it lacks any explanation or support. *Elder,* 529 F.3d at 413–14. The Commissioner argues that the ALJ's credibility findings were not patently wrong, [18] at 12–13, and this Court agrees.

Plaintiff suggests that the ALJ relied upon unfavorable evidence and ignored favorable evidence. Not so. The ALJ did not ignore favorable evidence, and instead she considered and rejected it. The ALJ determined that Plaintiff's statements about the intensity, persistence, and limiting effects of his symptoms were inconsistent with the medical evidence, including x-rays taken in 2015 and 2016 showing no significant degenerative signs or other changes when compared with the x-rays taken in 2013, before the alleged onset date. R. at 24. The ALJ also noted that, despite his complaints of pain and a recommendation that he receive physical therapy twice a week for four to eight weeks, Plaintiff attended just one physical therapy session and received treatment only sporadically; she also noted that, when he did seek

16

treatment, the records from such treatment indicated largely normal physical examination and normal gait. R. at 24–25. Although Plaintiff suggested that insurance played a role in his decision to not return for additional physical therapy, the ALJ found nothing in the record to support his suggestion. R. at 24.

The ALJ also observed that medical records from 2018 and 2019 dealt almost exclusively with Plaintiff's mental impairments, not his physical impairments, and mention work and other activities that appeared to be inconsistent with his claimed limitations. R. at 25. Records throughout 2019, including records documenting an emergency room visit just prior to his hearing before the ALJ, noted his ability to ambulate with a steady gait, even after reportedly suffering a seizure. *Id.*

Plaintiff argues that the ALJ improperly punished him because he helped a friend move a washing machine one time; he also argues that the ALJ should not have considered his sporadic treatment record or failure to obtain treatment or pursue therapeutic or surgical interventions because he could not afford them. *See* [11] at 14–15. But the ALJ considered these points among numerous others in deciding, based upon the entire record, that Plaintiff's complaints concerning the intensity, persistence, and limiting effects of his symptoms lacked credibility. Reading the ALJ's decision as a whole and giving it a "commonsensical reading rather than nitpicking at it," this Court finds that the ALJ properly supported her assessment of Plaintiff's symptoms. *Johnson v. Apfel,* 189 F.3d 561, 564 (7th Cir. 1999) ("When a claimant argues that there are fatal gaps or contradictions in the administrative law judge's opinion, thus appealing to the important principle of

17

administrative law that the agency provide a rational articulation of the grounds of its decision, we give the opinion a commonsensical reading rather than nitpicking at it.") (citations omitted).

## IV. Conclusion

For the reasons explained above, this Court finds that the ALJ's decision rests upon substantial evidence in the record. Accordingly, the Court affirms the Commissioner's decision to deny benefits.

Dated: June 10, 2022

Entered:

_____
John Robert Blakey
United States District Judge